## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

C.L.

Plaintiff,[1]

v.                                          Civil Action No. 1:19-cv-792

**JURY TRIAL DEMANDED**

David R. Wilson, FPC Alderson;
Jerrod R. Grimes, FPC Alderson;
Correctional Officer Amy Crawford FPC Alderson;
Correctional Officer Lane, FPC Alderson;
Correctional Officer Hayes, FPC Alderson;
Correctional Officer Gina Honaker, FPC Alderson;
Correctional Officer Chelsea Ryder, FPC Alderson;
Lieutenant Scott Hall, FPC Alderson;
Lieutenant Workman, FPC Alderson;
The United States of America;
and Nakamoto Group, Inc.


Defendants.

## **AMENDED COMPLAINT**

## **NATURE OF THE CASE**

1.      This is a civil action in which Plaintiff, C.L., by and through her attorneys, brings

claims based on the Eighth Amendment to the United States Constitution against

Defendants Jerrod R. Grimes, David R. Wilson, Amy Crawford, Hayes, Gina Honaker,

Lane, and Chelsea Ryder, Scott Hall and Workman, pursuant to the legal standards set

forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403

---

[1] These initials are a pseudonym used in this instance as the plaintiff is a victim of sexual abuse. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) and its progeny. Plaintiff C.L. also brings claims against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

2.      C.L., while an inmate in the custody of the Federal Bureau of Prisons ("BOP"), was caused to endure repeated episodes of sexual abuse, coerced sex, sexual assault, and sexual battery by Captain Jerrod Grimes and sustained damages as a proximate result.

3.      C.L. brings this suit to recover for the negligent acts of the BOP employees named herein, who failed in their duty to protect her from the known risk that Defendant Grimes posed to her and to all inmates confined at FPC Alderson. Defendant correctional employees working at FPC Alderson (hereinafter collectively referred to as the "Correctional Defendants") possessed information that Captain Grimes as an individual posed a threat to the safety of C.L. and all other inmates. Defendants Warden Wilson and Correctional Officer Crawford were also aware that Captain Grimes posed a significant risk of sexual assault and sexual abuse to the inmate population at FPC Alderson, including and especially C.L. and both failed in their duty to protect C.L. from same.

4.      As a federal inmate, C.L. was committed to the Government's care, custody, and control - her options for escape and for resistance were limited. Inmates at FPC Alderson rely on employees to protect them from sexual abuse by guards and staff.

5.      As a result of the harm sustained by her while she was an inmate at FPC Alderson, C.L. suffered injuries to include: physical and emotional harm, the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent, and from which she had no lawful means of escape.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter pursuant to U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. 2671, *et seq.* and against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).*

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all the events upon which this action is based occurred in the Southern District of West Virginia.

8.      Plaintiff has exhausted her federal tort claim administrative remedies as she filed an Administrative Tort Claim (Form 95) on February 4, 2019, with the Federal Bureau of Prisons' Mid-Atlantic Regional Office. As the six-month time period for a response has passed without Plaintiff having received a response, her claim has effectively been denied and her administrative remedy has been exhausted.

## PARTIES

Plaintiff

9.      Plaintiff, C.L., is a thirty-seven year old woman currently in the custody of the BOP at FMC Lexington. In 2015, she was convicted of drug offenses and sentenced to thirty-seven months in federal custody and began her sentence on 31 May, 2016 at FPC Alderson.

Defendants

10.     The United States of America is a sovereign entity named herein pursuant to the FTCA.

11.     Defendant the United States of America oversees the Federal Bureau of Prisons "Bureau" or "BOP", which is responsible for the custody and care of federal inmates.

12.     Defendant David R. Wilson was, at all times relevant to this complaint, a BOP employee and, on information and belief, he is a West Virginia resident. Defendant Wilson ("Warden Wilson" or "Wilson") was Warden of FPC Alderson, in which capacity he had full administrative responsibility for the entire institution. As Warden, Defendant Wilson had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FPC Alderson guards against inmates. As Warden, Wilson was responsible for compliance with BOP, FPC and PREA[2]-mandated standards. He was also responsible for supervising, training, and disciplining correctional officers at FPC Alderson. Warden Wilson is named in both his official and individual capacities.

13.     Defendant Jerrod Grimes is a convicted serial sexual abuser of BOP inmates. At all times relevant to this complaint, Jerrod Grimes ("Captain Grimes" or "Grimes") was employed by the BOP as Captain at FPC Alderson, in which capacity he supervised all security and correctional functions of the prison and had authority to initiate inmate disciplinary proceedings and to influence inmate housing and work assignments. Captain Grimes was responsible for maintaining the security and safety of inmates at FPC Alderson.

---

[2] Prison Rape Elimination Act, 2003.

14.     Captain Grimes was, at all times relevant to this action, the staff-member responsible for monitoring potential retaliation against inmates victimized by sexual abuse or sexual harassment at FPC Alderson, pursuant to the BOP's PREA-mandated policy concerning sexually abusive behavior prevention and intervention.

15.     At all times relevant to this complaint, Correctional Officer Amy Crawford ("Officer Crawford" or "Crawford") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Crawford was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.  Officer Crawford is named in her individual capacity.

16.     At all times relevant to this complaint, defendant Correctional Officer Lane ("Officer Lane" or "Lane") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Lane was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.  Officer Lane is named in his individual capacity.

17.     At all times relevant to this complaint, defendant Correctional Officer Hayes ("Officer Hayes" or "Hayes") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Lane was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of

inmates incarcerated there, including C.L.  Officer Lane is named in his individual capacity.

18.     At all times relevant to this complaint, Correctional Officer Gina Honaker ("Officer Honaker" or "Honaker") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Honaker was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.  Officer Gina Honaker is named in her individual capacity.

19.     At all times relevant to this complaint, Correctional Officer Chelsea Ryder ("Officer Ryder" or "Ryder") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Ryder was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.  Officer Ryder is named in her individual capacity.

20.     At all times relevant to this complaint, Lieutenant Scott Hall ("Lt. Hall" or "Hall") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Lt. Hall was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.  LT. Hall is named in his individual capacity.

21.     At all times relevant to this complaint, Lieutenant Workman ("Lt. Workman" or "Workman") was a correctional officer at FPC Alderson and, on information and belief,

a West Virginia resident. At all relevant times, Lt. Workman was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.L.[3] Lt. Workman is named in her individual capacity.

22.     All defendants above were, at all times relevant to this complaint, acting under color of United States law.

## FACTUAL BACKGROUND

23.     On or about 31 May, 2016, C.L. entered FPC Alderson to serve a thirty-seven month custodial sentence for drug charges.

24.     As part of C.L.'s admission to FPC Alderson in May 2016, she received training on the BOP's zero tolerance policy regarding sexual abuse of inmates and the reporting of sexual abuse; an Admission and Orientation Handbook; and a Prison Rape Elimination Act (PREA) pamphlet.[4]

25.     These orientation materials explain that inmates have a right to be free from sexual abuse by anyone, including staff members, the lack of an inmate's ability to consent to sexual abuse by staff members, the means of reporting sexual abuse, and available resources to inmates facing sexual abuse.

26.     The standard Admissions and Orientation Handbook given to C.L. on her entry to FPC Alderson also further explained that, as an inmate, she could report sexual abuse to

---

[3] Bureau of Prisons Position Description, Correctional Officer Series, GS-0007.

[4] Prison Camp Alderson Inmate Admissions and Orientation Handbook ("A&O Handbook"), 2012.The A&O Handbook includes an Attachment Entitled "Sexually Abusive Behavior and Prevention – Overview for Offenders" (A&O Handbook, pg. 73-77).

staff members within the institution, including a case manager, Chaplain, psychologist, SIS, the Warden, "or any other staff member you trust".[5]

27.    BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

28.    Program Statement 5324.12, "Sexually Abusive Behavior Prevention and Intervention Program" is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior.

29.    Program Statement 5324.12 is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

30.    BOP policy concerning the prevention of, and intervention upon sexually abusive behavior implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address the prohibited and/or illegal sexually abusive behavior involving, *inter alia,* staff perpetration against inmate victims.[6]

31.    BOP policy mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the

---

[5] FPC Alderson Inmate A&O Handbook, pg. 74.

[6] Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program. "Purpose and Scope" pg. 1.

Operations Lieutenant, or where appropriate, in accordance with the Program Statement 'Standards of Employee Conduct'."[7]

32.    Standards of employee conduct are mandated by BOP Program Statement 3420.11, which also is circulated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility. [8]

33.    BOP Standards of employee conduct are enumerated in Program Statement 3420.11. Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

34.    On information and belief, as BOP employees, Defendants Warden Wilson, Captain Grimes, Officers Crawford, Hayes, Honaker, Ryder and Lane, and Lieutenants Hall and Workman received and signed for updated versions of Program Statement 3420.11.

35.    Program Statement 3420.11 mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate".[9]

36.    As BOP employees, Defendants Wilson, Grimes, Crawford, Hayes, Honaker, Ryder, Lane, Hall and Workman would have been aware that "[e]mployees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature".[10]

---

7 Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, §115.61.
8 Program Statement 3420.11. Standards of Employee Conduct.

9  Program Statement 3420.11. Standards of Employee Conduct § 3. "Publication and Interpretation". pg. 5.

10  Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

37.    The above policies and procedures with respect to prevention, detection, reporting, and response to sexual abuse and sexual harassment were or should have been well-known to Defendants Wilson, Grimes, Crawford, Hayes, Honaker, Ryder, Lane, Hall and Workman - just as they were well known to other employees at FPC Alderson.

38.    Beginning in the spring and summer of 2016, Captain Grimes attended the location of C.L.'s work detail at the FPC Alderson Chapel to "hang out" while she worked there.  It was Captain Grimes' habit to **"hang out"** at the chapel and leer at inmates he was targeting for sexual abuse and it was also his habit to engage C.L. in sexually suggestive conversations.

39.     On one such occasion, Chaplain Gunn was present when Grimes attended the chapel and had occasion to observe Grimes' behavior.

40.    Chaplain Gunn had a duty to intervene upon and to report this improper conduct. Instead, Chaplain Gunn, by failing to intervene or to report this conduct by the Captain, tacitly condoned it and contributed to C.L.'s early impression – which was widely shared by both inmates and staff at FPC Alderson – that sexual misconduct with certain inmates would be tolerated.

41.    The term "boundary violation" refers to conduct that crosses the line between established norms of professional relationships between BOP staff and their inmate wards. Boundary violations are well-recognized as precursors to sexual activity between prison staff and inmates. [11]

---

[11]  Cheeseman Dial, Kelly & Worley, Robert. "Crossing the Line: A Quantitative Analysis of Inmate Boundary Violators in a Southern Prison System". *American Journal of Criminal Justice*. 33. 69-84, 2008.

42.    Captain Grimes began attending the Central Dining Room ("CDR") where inmates eat their lunch and staring at C.L. in the presence of other inmates and FPC Alderson staff. He paid an inordinate amount of attention to her in the presence of other staff and inmates and used his freedom of movement around the compound to stalk C.L.

43.    Defendant Hayes, who worked in the kitchen and coordinated the dining functions in the CDR, would have witnessed Captain Grimes' conduct during mealtimes, including his habit of sitting down next to C.L. and engaging in casual conversation.

44.    Defendant Hayes had a duty to report this habit of Captain Grimes' as a violation of BOP Policy on contact with inmates. At the very least, Grimes' conduct in sitting with C.L. during lunchtimes should have been reported as a violation of BOP policy against "show[ing] partiality" toward C.L.[12]

## **Sexual Battery by Captain Grimes: First Incident**

45.    In or around January, 2017, C.L. was reassigned from her work at the Chapel  to work at the Training Center where FPC Alderson staff attend in-service training courses. C.L. was chosen for this position by Officer Crawford, ostensibly because she had demonstrated enough maturity and responsibility to work there mostly alone during the day, preparing training materials for the upcoming staff training and setting up or tearing down audio-visual equipment for staff training presentations.

46.    In April 2017, C.L. was working at the Training Center with a fellow inmate, A.D., cleaning and storing catering equipment recently used for a luncheon to commemorate

---

[12] Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". Pg. 6.

the 90th Anniversary of FPC Alderson. A.D. was preparing to carry chafing dishes down to the basement of the storage room when Captain Grimes appeared and ordered C.L. to do it instead. Apparently sensing C.L.'s confusion and discomfort at Captain Grimes' demanded that she go down into the basement alone, A.D. insisted that she would do it instead. Captain Grimes became irate and insisted that C.L. take the dishes down to the basement and ordered A.D. to leave the Training Center.

47.    C.L. was, and indeed all inmates in BOP custody are, required to obey the commands of BOP guards. Indeed, "insolence towards a staff member" and "refusing to obey an order of any staff member" are both considered "moderate severity level prohibited acts".[13]

48.    Inmates who do not obey the verbal commands of BOP guards are subject to discipline for acts of insubordination, and the punishment for disciplinary infractions for failing to obey verbal commands of BOP guards range from loss of good conduct time to placement in a segregated housing unit.

49.    C.L. complied with Captain Grimes' order and when she reached the basement, Captain Grimes was behind her.  Standing behind C.L., Captain Grimes brushed his crotch against her buttocks while she bent over to store boxes. C.L. was shocked by this and attempted to relieve the tension of the situation by apologizing in an effort to suggest that the physical contact was incidental or accidental. Captain Grimes replied to C.L. that [the contact between them] "was fine" and stood there leering at her before she managed to get to the stairs and away from him.

---

[13] The various disciplinary infractions, and the corresponding sanctions for which prisoners found to have violated the rules of the prison camp, are outlined at pages 53-68 of the FPC Alderson Inmate Admissions and Orientation Handbook.  "Moderate Severity" disciplinary infractions, which include "insolence toward a staff member", "Interfering with a staff member in the performance of duties", and "Refusing to obey an order of any staff member" appear at pg. 58-59.

50.     BOP Policy defines "sexual contact" as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to humiliate, harass, degrade, arouse, or gratify the sexual desire of any person. C.L. did not report this incident, fearing that she would not be believed by other staff members. C.L. also feared that staff members of lower rank than the Captain would be disinclined to make their own lives difficult by taking her report against him seriously.

51.     Captain Grimes began to appear at the Training Center, where C.L. was often alone during the day, and escalated his campaign of sexual harassment directed toward her.

52.      Days after the first incident of sexual touching in April 2017, C.L. was working at the Training Center while Officer Crawford worked at a desk designated for staff use. Captain Grimes ordered C.L. to go to the kitchenette opposite Officer Crawford's desk to "make [him] some coffee". C.L. complied.

53.     Captain Grimes entered the kitchenette and instructed C.L. to go into the staff bathroom adjacent. There, Captain Grimes pulled down C.L.'s pants and sexually assaulted C.L. by repeatedly thrusting his penis into her vulva. This assault lasted less than five minutes and ended when Captain Grimes ejaculated in C.L.'s vagina. This incident caused C.L. physical pain, and she was shocked and confused by what was happening.

54.     C.L. relates that she was confused and dismayed that Officer Crawford had not taken steps to stop Captain Grimes from going into the bathroom with her where she could be assaulted.

55.      BOP Policy states that "[e]mployees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature".[14]

56.      BOP policy further mandates that no employee may "engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."[15]

57.      Defendant Crawford – like all BOP employees - was required to document and report information concerning possible incidents of sexual abuse in accordance with BOP policies concerning sexually abusive behavior and intervention prevention and standards of employee conduct.[16]

58.      BOP policy mandates that staff who become aware of any "violation or alleged violation of the Standards of Employee Conduct must report them to management (the CEO or OIA) or to the OIG at the Department of Justice". [17]

---

[14] Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 7.

[15] Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 7.

[16]  Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.61 Staff and agency reporting duties. "All staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement "Standards of Employee Conduct". Program Statement 3420.11 Standards of Employee Conduct. An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates. Employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

[17] Program Statement 1210.24. "Office of Internal Affairs"  § 8. "Reporting Incidents of Staff Misconduct". pg. 7.

59.     BOP policy concerning staff reporting of incidents of staff misconduct provides that "[a]ll Bureau staff are encouraged to use the OIG hotline if they wish to remain anonymous of fear retaliation or reprisal" for reporting "Department of Justice employees' misconduct".[18]

60.     In the face of clear boundary violations between Captain Grimes and C.L., Defendant Crawford failed to properly report and take action to mitigate the risk of potential future sexual abuse or sexual assault Grimes may have posed to C.L. and/or any other inmate.

61.     From that date, Captain Grimes appeared on a near-daily basis to have sexual contact with C.L. in the bathroom at the Training Center, which was less than a two-minute walk from his home on the FPC Alderson compound.

62.     It was Officer Crawford's duty, consistent with BOP policy, to report suspicious incidents indicating a risk of sexually abusive behavior by a fellow staff member towards C.L. – and indeed toward any inmate.

63.     Yet, either Officer Crawford did not report such incidents to the Warden, or her reports were not acted upon by Warden Wilson.

64.     C.L. was fearful of Captain Grimes because he repeatedly reminded her that he had the power to discipline her and other inmates, and to manipulate housing and work assignments as a means of punishing them.

65.     Captain Grimes indicated to C.L. that if she reported these and other instances of sexual abuse that she – not he – would be the one to suffer consequences, to include

---

[18] Program Statement 1210.24. "Office of Internal Affairs"  § 8. "Reporting Incidents of Staff Misconduct". pg. 7.

administrative sanctions, punishment, loss of privileges, and/or immediate transfer to a higher-security prison or to a prison with harsher conditions.

## **Correctional Defendants' Failure to Report or Intervene Upon Captain Grimes' Pattern of Sexual Predation Against C.L.**

66.    C.L. relates that Captain Grimes was open and blatant about his involvement in an inappropriate relationship with her. In that connection, Captain Grimes attended lunch in the CDR and sat with C.L. and conducted himself as though they were in a boyfriend-girlfriend relationship. This he did in view of the other inmates and in the presence of BOP staff, including staff assigned to work in the dining hall and kitchen, to include Defendant Hayes.

67.    Defendant Hayes, on seeing signs of what was an obviously inappropriate relationship between C.L. and Captain Grimes, either did not report it to the Warden or his report was not followed-up on or further investigated by same.

68.    On another occasion, Defendant Grimes attended a visitation between C.L. and her aunt and grandmother. C.L. relates that Captain Grimes sat down next to her and conducted himself as if he were meeting the family of his spouse for the first time. It would be abnormal in the extreme for any correctional officer, let alone a BOP employee of his rank, to attend a family visitation between an inmate and her relatives. This he did in the presence of (as yet unidentified) visitation room guards, who had a duty to report this incident as suspicious but apparently did not.

69.    This first incident followed a campaign of inappropriate conduct toward C.L. in the common areas of FPC Alderson outside of his office. Captain Grimes began following C.L. around the compound, appearing at her work detail during the day, and walking through the housing unit where she and other inmates slept during the night. This conduct alone should have prompted any guard at FPC Alderson who witnessed such behavior to make a report of improper activity, consistent with their responsibility to

report all behavior indicating a risk of sexual misconduct between BOP employees and inmates.

## Grimes is Reprimanded for Accessing Inmate Housing Units at Night

70.     Grimes was well-known by inmates and staff to be undertaking an informal patrol of inmate living quarters after his shift – which would normally involve work duties in the Administrative wing - had ended. Captain Grimes used his authority to access areas of the prison camp where inmates were housed at night.

71.     Inmates at FPC Alderson are accounted for, and an institution-wide census of inmates is taken during "count times". Inmates are counted at regularly scheduled intervals during the day, and after 4:00 p.m., they are expected to participate in two "standing counts" – one at 4:15 and the other at 9:15. "Standing counts" require that inmates stand beside their beds until count is cleared by staff. No movement of inmates from their living quarters is permitted until every inmate at FPC Alderson is accounted for.

72.     Inmates that are absent from standing counts – for example because they are in the infirmary or have been assigned a work task by a staff member, are accounted for in a logbook called the "out book". The absence of an inmate from their bedside, when not otherwise accounted for in the "out book", would be considered a major security issue indicating a possible escape. Inmates are not allowed out of their housing unit after the 9:15 count, which is the last "standing count" before bedtime. The last standing count is followed by a late evening count, wherein Correctional Officers use flashlights to perform counts.

73.     During the Spring and Summer of 2017, Captain Grimes attended the housing unit to take C.L. to the Training Center to have sex with him. Her absence was ostensibly excused because he was ordering her to go the Training Center to "work" after hours. Often, C.L. would return to her living quarters in the early morning hours. C.L.'s absences were accounted for in the "out book", which was provided to the correctional officers who worked night shift, to include Defendants Ryder, Honaker, and Lane.

74.     There would be no conceivable reason for an inmate to be performing the duty of cleaning the Training Center at night – especially an inmate who had been assigned that task on a full-time basis during the day as C.L. had been.

75.     Defendants Ryder, Honaker, and Lane had a duty to report this conduct as suspicious and indicating a risk of sexual misconduct by Defendant Grimes. Yet, either they did not report this conduct or they failed to ensure that it was investigated by either SIS or the Warden.

76.     On information and belief, Captain Grimes' conduct continued for months through the Summer of 2017, when Warden Wilson warned him not to attend the inmate housing units after his shift.

77.     In late Summer, 2017, C.L. was working with Defendant Crawford in her office and was present when Captain Grimes came into the office to complain that the Warden had reprimanded him for going into her housing unit at night. C.L. relates that Captain Grimes was irate, yelling to both C.L. and Officer Crawford that Warden Wilson was a "cracker" and lamenting that he was being targeted for discipline by Warden Wilson because he was African American.

78.    Despite the former's reprimand of Captain Grimes, neither Defendant Wilson nor Defendant Crawford took steps to prevent Captain Grimes from continuing to come to the inmates' housing unit at night.

79.    Days later, Captain Grimes drove his black SUV in the middle of the night up to the door of C.L.'s housing unit. Inmate housing units are not proximate to the staff parking lot, and BOP staff do not generally enter BOP property in their own private vehicles for any reason. Nevertheless, Captain Grimes drove his SUV to the housing unit door late at night, entered the building, and demanded that C.L. get out of bed and accompany him to the Training Center where they had sex.

80.    Defendant Grimes continued, on a near-daily basis for the next three months, to retrieve C.L. from where she was sleeping for the night so that he could have sexual relations with her.

### Grimes' Pattern of Openly Targeting C.L. for Sexual Abuse During the Day

81.     At FPC Alderson, inmates are summoned to report to the Administrative Building by means of a call on the "Red Phone". All calls on the Red Phone between the Administrative Building and other buildings at the work camp – including the inmate housing units – are routed through the control room.

82.    On a number of occasions throughout the Summer and Fall of 2017, Captain Grimes used the "Red Phone" to summon C.L. to his office, where he would sexually abuse or sexually assault her.

83.    C.L. continued to be fearful of Captain Grimes and did not report the sexual abuse. On one occasion in Spring of 2017, Captain Grimes made a point of showing C.L. the plaques commemorative of his service to the BOP and to the U.S. Armed Forces and

told her directly that if she reported him for sexual abuse that she would not be believed and that he would be protected by his BOP colleagues and by his union.

84.    Captain Grimes' conduct was calculated to threaten, isolate, shape, and coerce C.L. and it placed her in substantial fear that she would suffer further sexual abuse by him.

85.    All inmates attending the Captain's office must first walk by a glass-walled control room where guards assigned to control-room duty can observe people coming and leaving the area.

86.     On at least one occasion, Officer Lane saw C.L. walk to Captain Grimes' office after having been called on the Red Phone.

87.    On at least one occasion, Officer Honaker saw C.L. walk to Captain Grimes' office after having been called on the Red Phone.

88.    On many occasions, Lt. Workman, who was stationed in the Lieutenants' office across from Captain Grimes' would have seen C.L. go into his office alone and unsupervised.

89.    On many occasions, Lt. Hall, who was stationed in the Lieutenants' office across from Captain Grimes' would have seen C.L. go into his office alone and unsupervised.[19]

90.    The sheer frequency of C.L.'s visits to the Captain's office should have been sufficient for Defendants Hall, Honaker, Lane, and Workman to report Captain Grimes' conduct either to the Warden, SIS, or the OIG.

---

[19] Officer Hall violated 18 U.S.C. § 1791(a)(1), (b)(5) while working as an employee of the BOP as a correctional officer at FPC Alderson, and subsequently pled guilty to one count of same. Hall was imprisoned for 30 days and paid a court assessment of $10 for this violation, which consisted in "knowingly and unlawfully provid[ing] notes of a romantic nature, a prohibited object, to an inmate at Federal Prison Camp at Alderson" with an "Offense Ended" date of September 2017.

91.    C.L. believed that Captain Grimes' sexual abuse of her would continue because a number of BOP employees at Alderson, each of whom had a duty to report suspicious conduct indicating a risk of sexual abuse of an inmate by a staff member, were aware that she was being summoned to his office alone for reasons having nothing to do with discipline and that she was there alone with him unsupervised.

92.    C.L. did not report this conduct because she believed that doing so would be futile. Indeed, the wholesale failure of staff at FPC Alderson to intervene in Captain Grimes' conduct toward her consolidated her impression that her sexual abuse by him was both well-known and tolerated.

93.    Defendants Hall, Honaker, Lane, and Workman – like all BOP employees - were required to document and report information concerning possible incidents of sexual abuse in accordance with BOP policies concerning sexually abusive behavior and intervention prevention and standards of employee conduct.[20]

94.    Defendants Crawford, Hall, Honaker, Lane, Wilson, and Workman - like all BOP employees – were aware that it was their duty, in accordance with the Bureau's Standards of Employee Conduct, to report any violation or alleged violation of the

---

[20] Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.61 Staff and agency reporting duties. "All staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement "Standards of Employee Conduct". Program Statement 3420.11 Standards of Employee Conduct. An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates. Employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

Standards of Employee Conduct to either the Warden or to the Office of Internal Affairs (OIA) or to the Office of the Investigator General (OIG) at the Department of Justice.[21]

## Institutional Failure to Timely Respond to Formal Complaints Against Captain Grimes by Alderson Inmates

95.    Sexual activity between inmates and correctional officers is prohibited by West Virginia state law and by federal law.

96.    Sexual activity between inmates and correctional officers is also clearly prohibited by BOP policy, agency-wide.

97.    BOP policy addresses the notion of consent with respect to sexual activity between guards and inmates. Program Statement 3420.11 clearly states: "[t]here is never any such thing as *consensual* sex between staff and inmates".[22]

98.    BOP policy provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices.[23]

99.    On 29 April, 2017, an Alderson inmate, V.J.[24], drafted a formal administrative remedy request (a "BP-9") concerning an incident involving Grimes.

100.    In her BP-9 request, V.J. relates that Grimes, in plain view of several inmates in her housing unit, lost his temper and physically backed her into her living quarters, demanding that she sit down in the chair behind her.

---

[21] Program Statement 1210.24. "Office of Internal Affairs" § 8. "Reporting Incidents of Staff Misconduct". pg. 7.

[22] Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

[23] Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.51 "Inmate Reporting". Pg. 35.

[24] These initials are a pseudonym used in this instance as she is a victim of sexual misconduct who made formal complaints regarding the same. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

101.    V.J. further relates that "I covered my head and had to flinch to keep my mouth from being pressed to his crotch. I felt so helpless and victimized and violated". [25]

102.    This BP-9 request continues: "PLEASE HELP ME. My rights have been violated and so has PREA."[26]

103.    Further, V.J.'s BP-9 request states: "I cannot send this complaint through this institution...We are all scared of retaliation. It is very real here. I was already warned by Admin that it was a bad idea to pursue this and that the Captain had just had 'a bad day'".[27]

104.    On 18 May, 2017, V.J. sent an electronic request through the internal email at FPC Alderson to SIS asking why this incident had not been investigated. Describing this incident in the course of her emailed complaint, V.J. clearly identifies "the Captain" as engaging in conduct "violating  PREA".[28]

105.    V.J.'s BP-9 was received on 26 May, 2017, by regional counsel in the BOP's Mid-Atlantic Office.

106.    Four days later, on 30 May, 2017, the administrative remedy coordinator at the Mid-Atlantic Regional Office notified V.J. that her administrative remedy had been denied because she had not filed it through the institution for Warden Wilson's review.

107.    On 19 June, 2017, the BOP South Central Regional Office Legal Department received V.J.'s BP-9.

---

25 BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

26 BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

27  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

28 BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

108.    Subsequent to V.J.'s formal complaints of sexually abusive conduct to SIS at FPC Alderson and to two separate regional offices, Grimes continued in his campaign of sexual abuse of inmates at FPC Alderson and he continued to sexually abuse C.L. for months.

### Captain Grimes Resigns and is Subsequently Indicted

109.    On or about 21 December, 2017, Warden Wilson authorized Captain Grimes' resignation and he left FPC Alderson, effectively bringing an end to his sexual abuse of C.L. and the other inmates that he targeted for sexual abuse and sexual assault.

110.    Captain Jerrod Grimes was subsequently indicted. Later, he pled guilty to thirteen counts of sexual abuse of a ward and abusive sexual contact contrary to 18 U.S.C. § 2243(b) and 18 U.S.C. § 2244(a) (4).

111.    The first count of sexual assault of a ward to which Grimes entered a guilty plea dates back to November 2016, months before he began sexually abusing C.L. in April 2017.

112.    Grimes' serial sexual abuse and assault of inmates continued for more than a year and ended only when he resigned after observing victims – including C.L. - being interviewed by investigators on 21 December 2017.

### COUNT I
### Eighth Amendment: Sexual Abuse, Battery and Sexual Harassment
### (Captain Grimes)

113.    C.L. realleges and incorporates by reference the allegations of paragraphs 1-112 above.

114.    C.L. had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

115.    Sexual abuse by a guard is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

116.    Captain Grimes violated C.L.'s rights by repeatedly assaulting her, using coercion to have sexual contact with her for his gratification, and sexually abusing her while she was incarcerated at FPC Alderson from April 2017 until December 2017.

117.    Captain Grimes, individually, failed in his duty to provide C.L. with constitutionally safe and secure conditions of confinement by subjecting her to sexual abuse and battery.

118.    As a direct and proximate result of Captain Grimes' sexual abuse, C.L. was subjected to unnecessary and wanton pain, and emotional and physical injury, and systematic retaliation and she is entitled to redress for this serious dignitary injury and for this violation of her person.

119.    Captain Grimes' sexual abuse of C.L. amounted to outrageous conduct and was inhumane in the extreme.

120.    All of Grimes' acts and omissions were taken while acting under color of law and in his position as a supervisor of FPC Alderson.

### COUNT II
### Eighth Amendment: Failure to Intervene
### (Warden Wilson, Officer Crawford, Officer Hayes, Officer Honaker, Officer Ryder, Officer Lane, Lt. Hall, and Lt. Workman)

121.    C.L. realleges and incorporates by reference the allegations of paragraphs 1-120 above.

122.    On information and belief, Warden Wilson knew that Captain Grimes was sexually harassing and assaulting inmates at FPC Alderson. Warden Wilson had to have been apprised of the incident involving V.J.

123.    Warden Wilson and Officer Crawford were deliberately indifferent and even complicit in the risk faced by C.L. relative to Captain Grimes by failing to take such steps as could be reasonably expected to address the danger that he posed.

124.    The inaction of the Correctional Defendants, who were responsible for the custody, care, safety, and "correctional treatment" of C.L. in the face of this known risk to her safety was a direct and proximate cause of the violation of C.L.'s rights under the United States Constitution.

125.    The acts, omissions, policies, and practices o of Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman constituted a knowing violation of C.L.'s clearly established constitutional rights.

126.    C.L.'s constitutional right not to be sexually abused or assaulted in prison was firmly established well before the BOP rules establishing mandatory procedures for handling sexual abuse cases to comply with PREA went into effect on June 24, 2015.

127.    Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman failed in their respective duties to provide C.L. with constitutionally safe and secure conditions of confinement by and through their deliberate indifference to the substantial risk of imminent harm posed by Captain Grimes.

128.    The policies, practices, acts, and omissions of of Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman, directly and proximately caused the violation of C.L.'s Eighth Amendment right to be free from sexual abuse and sexual battery while incarcerated.

129.    Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman directly and proximately caused the violation of C.L.'s

rights under the Eighth Amendment of the United States Constitution by, as one example, failing to train, supervise, and discipline FPC Alderson staff and employees and/or report known or suspected sexual misconduct thereby failing to adequately prevent further constitutional violations.

130.    Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman directly and proximately caused the violation of C.L.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to adhere to and /or ensure that FPC Alderson staff followed PREA-mandated policy for responding to suspected or known instances of sexual abuse at the institution, thereby failing to adequately prevent further constitutional violations.

131.    Warden Wilson directly and proximately caused the violation of C.L.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to ensure the coordination of departments within the facility in preventing, detecting, intervening, and responding to sexually abusive behavior.

132.    Warden Wilson, Officer Crawford, and Lieutenants Hall and Workman directly and proximately caused the violation of C.L.'s rights under the Eighth Amendment of the United States Constitution by consistently failing to establish and enforce procedures for investigations of disciplinary infractions or report the same so as to limit opportunities for FPC Alderson staff to be alone with inmates  unsupervised, providing the conditions of opportunity for them to have sexual contact with, or to sexually assault or rape persons in the custody of the BOP at FPC Alderson.

133.    Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman,  directly and proximately caused the violation of C.L.'s rights under the Eighth Amendment of the United States Constitution by failing to make

such further inquiries or interventions as would be reasonable given their knowledge that Captain Grimes had been alone for an unknown period of time unsupervised and unobserved in his office with an inmate, thereby placing C.L. in substantial risk of imminent sexual abuse by him.

134.    By their acts and omissions, Warden Wilson, Lieutenants Hall and Workman, and Officers Crawford, Hayes, Honaker, Ryder, and Lane placed C.L. in substantial risk of imminent further sexual abuse and took no immediate action to protect C.L. from further sexual abuse by Captain Grimes, as when, for example, they failed to *formally* report or make such further inquiries as would be reasonable given their duty to act immediately in mitigating such risk.

135.    Warden Wilson, Officers Crawford, Hayes, Honaker, Ryder, and Lane, and Lieutenants Hall and Workman, engaged in a direct violation of C.L.'s constitutional rights by failing to take measures to protect C.L. and all inmates at FPC Alderson in the face of her actual or constructive knowledge of the risk posed by Captain Grimes, thereby subjecting them to substantial risk of imminent sexual abuse.

136.    The conduct of prison officials at FPC Alderson, which proximately caused C.L.'s injuries was of such a quality and nature as to warrant each defendant's liability for punitive damages, in accordance with applicable law.

### COUNT III
### Federal Tort Claims Act: NEGLIGENCE
### (United States of America)

137.    Plaintiff realleges and incorporates paragraphs 1-136.

138.    Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including United States Federal Prison Camp Alderson.

139.    Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia.

140.    Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

141.    Defendant United States and the supervisors and employees of FPC Alderson have a duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

142.    As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

143.    Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from harm caused by correctional officers and other prison officials.

144.    Correctional officers and other prison officials at FPC Alderson have a duty to house inmates in a safe and secure manner.

145.    Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from known and obvious dangers posed by correctional officers and other prison officials.

146.   Correctional officers and other prison officials at FPC Alderson have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

147.   Pursuant to 28 C.F.R. § 115.17(f), FPC Alderson and Warden Wilson had a non-discretionary duty to ask Captain Grimes in interviews and written self-evaluations conducted as part of his performance reviews about all incidents of alleged sexual abuse by Grimes, including but not limited to the incident described by V.J. in her administrative complaint (however technically deficient). Upon information and belief, FPC Alderson and Warden Wilson breached this non-discretionary duty.

148.   Pursuant to 28 C.F.R. § 115.31, BOP and FPC Alderson had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse. Based on the known and already alleged facts—the incident with V.J. reported to BOP administrative officials—there are two possibilities: (1) Either FPC Alderson and the BOP failed to perform these non-discretionary duties with respect to training, or (2) Warden Wilson, Lieutenants Hall and Workman, and Correctional Officers Crawford Hayes, Honaker, and Lane, (as yet unidentified) BOP administrative officials, and other (as yet unidentified) corrections officers at FPC Alderson were carelessly inattentive to the instructions, training, and visible signs all around them that Grimes was raping and otherwise assaulting and harassing inmates, including C.L.

149.   Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FPC Alderson had a non-discretionary duty to train employees and advise inmates of their right to be free from

31

retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers. Based on the known and already alleged facts—the incident with V. J. reported to BOP administrative officials because of a fear of reporting within FPC Alderson, and the failure of BOP officials to "remind" the individual that she could report without fear of retaliation;—it is clear that this training either did not occur or the BOP and FPC Alderson failed to supervise employees to make sure the training was given, understood, and followed.

150.    Pursuant to 28 C.F.R. § 115.17, BOP and FPC Alderson officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider, with respect to hiring and promotion decisions, any incidents of sexual harassment, whether the inmate has engaged in sexual abuse, and whether the inmate has been convicted or civilly adjudicated of sexual abuse. Upon information and belief, with respect to Defendants the hiring and repeated promotions of Grimes, BOP and FPC Alderson officials failed to perform their non-discretionary duties.

151.    BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FPC Alderson in order to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

152.    Correctional officers and supervisors have a non-discretionary duty to report suspicion of sexual abuse by correctional officers and supervisors have a non-discretionary duty to investigate such reports and to take action with respect to substantiated reports.

153.    Correctional officers at FPC Alderson knew that Captain Grimes posed an excessive and unreasonable risk to the health and safety of C.L. and that he had been sexually abusing inmates at FPC Alderson for "years." One of the following had to have occurred: (1) the correctional officers, as alleged above, breached their non-discretionary duty to report their direct   knowledge or belief of Grimes' or other officer's sexual misconduct; (2) the supervisors failed in their non-discretionary duties to investigate and take action with respect to Grimes' specific misconduct; or corrections officers and supervisors were carelessly inattentive with respect to the signs all around them.

154.    Prison officials at FPC Alderson knew or should have known that Captain Grimes should not have been permitted to have unsupervised access to inmates, including C.L., to whom he posed an excessive and unreasonable risk.

155.    As a direct result of the prison officials' breach of their non-discretionary duties or their reckless, willful, wanton and careless disregard of the obvious and known risk to inmates in improperly performing them, C.L. suffered personal injury and severe emotional distress from sexual abuse  at the hands of Grimes despite the fact that, according to at least one corrections officer, employees at FPC Alderson knew for years that Grimes was sexually abusing inmates.

**Count IV**
**BACKGROUND ALLEGATIONS**
**(Nakamoto Group, Inc.)**

156.    Plaintiff realleges and incorporates paragraphs 1-155.

157.    Defendant Nakamoto Group, Inc. (Nakamoto) is a Delaware Corporation with its principal place of business in the State of Maryland.

158.    At all times relevant to this amended complaint, Nakamoto was the auditor for inspecting, monitoring and oversight of BOP compliance with PREA standards at FPC Alderson.

159.    The BOP contracted with Nakamoto to carry out inspections of FPC Alderson in accordance with the standards mandated by PREA. Nakamoto was contractually obliged to carry out those inspections as part of the auditing process required by PREA for the benefit of all inmates in the custody of FPC Alderson.

160.    Nakamoto contractors conducted audits of FPC Alderson in 2015 and in 2017.

161.    Nakamoto negligently performed the auditing functions under PREA and breached its contractual and/or other legal obligations as more specifically alleged below.

162.    The PREA audits conducted by Nakamoto were materially incomplete, as auditors failed to properly conduct required systematic reviews of documents held by FPC Alderson relating to sexual abuse and sexual harassment allegations and failed to properly interview inmates and/or staff that were involved in or witness to PREA violations by defendant Grimes or any other correctional officer.

163.    The failure of Nakamoto to conduct a thorough audit of FPC Alderson and investigate allegations of staff sexual misconduct allowed Grimes to stay in his position and have unfettered access to inmates, including C.L., rather than facing termination from employment or removal from his duties at FPC Alderson.

## COUNT V
## NEGLIGENCE
## (Nakamoto Group, Inc.)

164.    Plaintiff realleges and incorporates paragraphs 1-163.

165.    As mandated by PREA, the BOP conducts PREA audits at each federal prison facility once every three years.

166.    The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison.  During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review and retain key documents maintained by the facility.

167.    During the "onsite review" component of an audit, PREA compliance auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and conducting interviews with both executive and rank-and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited English language proficiency and transgender inmates.  Finally, PREA audits are supposed to involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

168.    At all times relevant to this complaint, PREA audits for a large number of BOP facilities were conducted by Nakamoto.

169.    As the PREA auditor for FPC Alderson, Nakamoto has owed all inmates there, including plaintiff, a duty of care to conduct its audits with ordinary skill, care, and diligence commensurate with that rendered by members of Nakamoto's profession.

170.    Prior to going onsite to a facility, Nakamoto failed to conduct a broad internet search on the audited facility to determine if there was any relevant information that might have shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit or if Nakamoto did conduct such a search it ignored the readily available information regarding longstanding and ongoing sexual misconduct at FPC Alderson.

171.    PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." In order to meet the requirements in this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

172.    Nakamoto was required to be critically engaged with critical facility functions including but not limited to intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance technology deployment and use; access to reporting entities; and supervision practices at FPC Alderson.

173.    Nakamoto was required to review internal records at FPC Alderson as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record.

174.    Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its auditor staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FPC Alderson.

175.    Nakamoto consistently failed to conduct thorough examinations of critical facility functions FPC Alderson.

176.    Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well known activities of defendant Grimes and/or other staff at FPC Alderson.

177.    Nakamoto generally failed to conduct its audits at FPC Alderson with the level of care imposed upon it by law and consequently breached its duty of care to the inmates there, including plaintiff in particular.

178.    Some or all of Nakamoto's breaches of its duty of care to plaintiff occurred prior to defendant Grimes' sexual misconduct against plaintiff.

179.    Had Nakamoto fulfilled its duty of care, defendant Grimes' sexual misconduct against plaintiff would not have occurred.

180.    Nakamoto knew or should have known that a failure on its part to fulfill its auditing duty of care would result in the commencement and/or continuation of sexual misconduct perpetrated by correctional officers such as defendant Grimes against female inmates such as plaintiff.

181.    As a proximate result of Nakamoto's failure to meet its duty of care, and the associated and/or consequential failure to identify and address obvious signs of endemic sexual abuse at FPC Alderson, C.L. and other female inmates at FPC Alderson sustained injuries and damages.

## COUNT VI
## BREACH OF CONTRACT
### (Nakamoto Group, Inc.)

182.    Plaintiff realleges and incorporates paragraphs 1-181.

183.    At all times pertinent to this Complaint, Nakamoto operated as an SBA 8(a) Program minority business which, because of such status, received certain preferential treatment in applying for and receiving bids on Federal government contacts.

184.    After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

185.    As a part of the aforementioned contracting process, Nakamoto had a contract to perform PREA audits at FPC Alderson.

186.    Upon information and belief, the contract regarding PREA audits for BOP correctional facilities, including FPC Alderson, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

187.    The purpose of the Prison Rape Elimination Act (PREA) auditing function, which the contract with Nakamoto was to provide for the BOP, was to ensure compliance with the mandates of the Prison Rape Elimination Act (PREA) 34 U.S. Code § 30301.

188.    The purpose of the Act is to "provide for the analysis of the incidence and effect of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape."

189.    C.L. at all times relevant to the allegations herein was a federal inmate and thus an individual to be protected "from prison rape."

190.    C.L. as an inmate is a member of the class of persons the PREA auditing function was designed to protect.

191.    The contract between Nakamoto and the BOP was made and intended for the benefit of plaintiff as a member of the class definitely and clearly within the terms of the contract.

192.    Nakamoto breached the contract, including by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to not only fulfill the purpose of PREA "to protect individuals from prison rape" but to also help fulfill their mandated duty to  "provide for the safekeeping, care, ... of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the united states." under 18 U.S.C. § 4042(a)(2)-(3).

193.    As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, C.L. was injured and damaged as alleged hereinabove.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1.    Compensatory damages as to all Counts;

2.    Punitive damages as to all Counts, excepting Count III against The United States Of America;

3.    Reasonable attorneys' fees and costs; and,

4.    Such other further relief as this Court deems just.

5.    Plaintiff hereby demands a jury trial on all Counts so triable.

**C.L.,**
Plaintiff,

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@calwelllaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@calwelllaw.com

*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com